FIRST NAT. BANK OF ANAMOOSE v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. June 13, 1913.)

No. 3,751.

*(Syllabus by the Court.)*

1. STATUTES (§ 47*)—CERTAINTY.—PENAL STATUTE—PARTICULAR CLASSES OF PERSONS.

A penal statute which creates a new crime and prescribes a punishment for it must clearly state the persons and acts denounced.

A person who, or an act which, is not by the expressed terms or plain meaning of the law clearly within the class of persons or within the class of acts it denounces, will not sustain a conviction under it.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 47; Dec. Dig. § 47.*]

2. STATUTES (§ 194*) — CONSTRUCTION — EJUSDEM GENERIS — DEFINITION OF CRIMES.

The rule that, where general words follow the enumeration of particular classes of persons or of acts, the general words should be construed to apply to persons or acts of the same general nature or class as those enumerated, is especially applicable to statutes defining crimes and regulating their punishment.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 272; Dec. Dig. § 194.*]

3. STATUTES (§ 218*)—CONTEMPORANEOUS CONSTRUCTION—EXECUTIVE OFFICERS.

It is an established rule of the national courts that the contemporaneous construction given to an act of Congress by the executive officers charged with its enforcement, though not controlling, is entitled to great weight, and should not be disregarded or overturned except for cogent reasons, nor unless it is clear that their interpretation was erroneous.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 294, 295; Dec. Dig. § 218.*]

4. INTOXICATING LIQUORS (§ 138*)—TRANSPORTATION AND SALE—COLLECTION OF PRICE—BANKS.

The collection by a bank of a sight draft for the purchase price of liquor transported in interstate commerce and the delivery to the consignee of a bill of lading attached to the draft, the possession of which bill was necessary to enable the consignee to obtain a delivery of the liquor, does not subject the bank to a fine under section 239 of the Penal Code (Act March 4, 1909, c. 321, 35 Stat. 1136 [U. S. Comp. St. Supp. 1911, p. 1662]).

[Ed. Note.—For other cases, see Intoxicating Liquors, Cent. Dig. § 148; Dec. Dig. § 138.*]

Trieber, District Judge, dissenting.

In Error to the District Court of the United States for the District of North Dakota; Charles F. Amidon, Judge.

The First National Bank of Anamoose was convicted of violating Pen. Code, § 239, in collecting a draft attached to a bill of lading for intoxicating liquors (190 Fed. 336), and it brings error. Reversed, with directions.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

George A. Bangs, of Grand Forks, N. D., and Lawrence Maxwell, of Cincinnati, Ohio (George R. Robbins, of Grand Forks, N. D., and Joseph S. Graydon, of Cincinnati, Ohio, on the brief), for plaintiff in error.

Edward Engerud, U. S. Atty., of Fargo, N. D., and Charles E. Littlefield, of New York City, Sp. Asst. Atty. Gen., for the United States.

William W. Watts, of Louisville, Ky., amicus curiæ.

Before SANBORN, Circuit Judge, and WILLIAM H. MUNGER and TRIEBER, District Judges.

SANBORN, Circuit Judge. The First National Bank of Anamoose complains that it was convicted and fined under section 239 of the Penal Code upon these conceded facts: One Meyers, a resident of Anamoose, in North Dakota, ordered a case of beer of the Hamm Brewing Company, a corporation of Minnesota. The Brewing Company accepted the order at St. Paul, shipped the beer thence to Anamoose via the "Soo" Railway Company, and received a bill of lading from that company under an agreement that the company would not deliver the beer to Meyers until he presented the bill of lading to its agent at Anamoose. The Brewing Company then attached a sight draft on Meyers for the purchase price of the beer to the bill of lading, and sent them to the bank at Anamoose, which agreed with the vendor to collect the draft from Meyers, and to deliver the bill of lading to him so as to enable him to receive the shipment of beer from the Railroad Company, and thereby to complete the sale and delivery of the beer. Section 239 of the Penal Code reads in this way:

"Any railroad company, express company, or other common carrier, or any other person who, in connection with the transportation of any spirituous, vinous, malted, fermented, or other intoxicating liquor of any kind, from one state, territory, or district of the United States, or place noncontiguous to but subject to the jurisdiction thereof, into any other state, territory, or district of the United States, or place noncontiguous to but subject to the jurisdiction thereof, or from any foreign country into any state, territory, or district of the United States, or place noncontiguous to but subject to the jurisdiction thereof, shall collect the purchase price or any part thereof, before, on, or after delivery, from the consignee, or from any other person, or shall in any manner act as the agent of the buyer or seller of any such liquor, for the purpose of buying or selling or completing the sale thereof, saving only in the actual transportation and delivery of the same, shall be fined not more than five thousand dollars."

Counsel for the bank contend that the facts of the case did not bring it, or its act, within any of the classes of persons or acts which this statute subjects to fine for collecting the price of liquor. The attorneys for the government, on the other hand, insist that the statute subjects to punishment all persons and all corporations that collect the purchase price of liquor transported in interstate commerce, or that act as agents of vendor or vendee in the buying or selling thereof, and this interpretation of the law was sustained in an elaborate opinion by the learned judge below which may be found in 190 Fed. 336.

The statute, however, does not read, as it seems as though it naturally would have read if such had been the intention of Congress, that every person who, in connection with the transportation thereof in in-

terstate commerce should collect the purchase price of interstate liquor, or who should act as the agent of the buyer or seller for the purpose of buying, selling, or completing the sale thereof, should be fined thereunder. By the terms it contains it does not embrace within its denunciation all persons, but expressly limits its condemnation to "any railroad company, express company, or other common carrier, or other person," who in connection with the interstate transportation collects or acts as agent. And, if the contention of counsel for the government were to prevail, the words "railroad company, express company, or other common carrier, or other" in the law would become futile, and the statute would be made to read "any person who," etc., in violation of the maxim that "all the words of a law must have effect rather than that part should perish by construction." City of St. Louis v. Lane, 110 Mo. 254, 258, 19 S. W. 533; Knox Co. v. Morton, 15 C. C. A. 671, 675, 68 Fed. 787, 790; Wrightman v. Boone County, 31 C. C. A. 570, 572, 88 Fed. 435, 437; Paving, etc., Company v. Ward, 28 C. C. A. 667, 674, 85 Fed. 27, 34.

[1] The statute creates and denounces a new offense. A penal statute which creates a new crime and prescribes its punishment must clearly state the persons and acts denounced. A person who, or an act which, is not by the expressed terms of the law clearly within the class of persons, or within the class of acts, it denounces will not sustain a conviction thereunder. One ought not to be punished for a new offense unless he and his act fall plainly within the class of persons or the class of acts condemned by the statute. An act which is not clearly an offense by the expressed will of the legislative department before it was done may not be lawfully or justly made so by construction after it is committed, either by the interpolation of expressions or by the expunging of some of its words by the judiciary. Ex post facto construction is as vicious as ex post facto legislation. "To determine that a case is within the intention of a statute its language must authorize us to say so. It would be dangerous indeed to carry the principle that a case which is within the reason or mischief of a statute is within its provisions so far as to punish a crime not enumerated in the statute because it is of equal atrocity, or of kindred character, with those which are enumerated. The case must be a strong one, indeed, which would justify a court in departing from the plain meaning of words in search of an intention which the words themselves did not suggest." United States v. Wiltberger, 18 U. S. (5 Wheat.) 76, 96, 5 L. Ed. 37; United States v. Ninety-Nine Diamonds, 139 Fed. 961, 964, 72 C. C. A. 9, 12, 2 L. R. A. (N. S.) 185, and cases there cited.

The apparent and natural meaning of the terms of a statute is always to be preferred to any curious or hidden signification reached by the reflection and ingenious reasoning of unusually strong and acute minds. And, unless at the time this bank was charged with the violation of this statute this act of Congress clearly expressed to a man of ordinary ability and intelligence the meaning that the collection by a bank of a sight draft for the purchase price of liquor that had been transported in interstate commerce and the delivery to the purchaser of the bill of lading therefor attached to the draft subjected that bank

to the fine which the statute prescribed, the defendant below ought not to be and must not be punished by this fine. We confess that the first reading of this law did not suggest to our minds that a bank which made such a collection would thereby subject itself to the punishment specified in the act. It is evident that the law failed to suggest such a thought to the mind of Judge Smith, who in writing the opinion of this court in United States Express Company v. Friedman, 191 Fed. 673, 681, 112 C. C. A. 219, spoke of this section 239 as prohibiting "common carriers from collecting the purchase price of liquors on interstate shipments, or from in any way acting as agent of the buyer or seller of such liquors, except in the transportation and delivery of the same, under the penalty of a fine of not over $5,000," or of Judge Hough who, in his opinion in United States v. Eighty-Seven Barrels, etc., of Wine (D. C.) 180 Fed. 215, 216, said:

"Section 239 renders it criminal for any common carrier transporting or delivering liquor after interstate or international transportation to 'collect the purchase price or any part thereof,' or 'in any manner act as the agent of the buyer or seller of any such liquor, for the purpose of buying or selling or completing the sale thereof, saving only in the actual transportation and delivery of the same.'"

In January, 1910, Judge Campbell of the Eastern District of Oklahoma, in a considered opinion, decided that such a collection by a bank did not subject it to the fine imposed by this law. Danciger v. Stone (C. C.) 188 Fed. 510, 512. The Secretary of the Treasury and the Attorney General of the United States, the heads of the executive departments of the government to which the enforcement of this law was intrusted, were of the same opinion. The Attorney General, speaking of the statute, said:

"The act does not apply to banks, collecting drafts with bill of lading attached, where the shipment is made to a real consignee upon an order sent by him and filled by shipment from the dealer's place of business. The collection of a draft for the purchase price of a commodity in that manner is the usual and ordinary method of carrying on business and is not connected with the transportation of the property within the meaning of the statute under consideration." 29 Opinions Attorneys General, 58, 62.

Indeed, although this statute was enacted on March 4, 1909, no one except the United States Attorney for North Dakota seems to have discovered that it was intended to subject banks collecting such drafts to punishment by fine, until the opinion of the court below to that effect was formed and expressed in June, 1911. The act for which this bank has been convicted and fined was done on March 15, 1911. If the concession were made that it was the intention of the Congress to include banks among those liable to fines for such acts as that committed by the defendant below, how, in view of these opinions of judges and executive officers, can the conclusion that this intention was not clearly expressed by the statute be escaped? It is only when a penal statute clearly and plainly subjects parties and acts to its denunciation that they may be lawfully punished thereunder. If it is doubtful whether or not it includes them they ought to be and must be exempt from criminal prosecution thereunder. And it is the intention expressed in the statute and that alone to which courts may give effect. They

may not assume or presume purposes and intentions that the terms used in the statute do not indicate and then by construction practically enact or expunge provisions to accomplish such supposed intentions. United States v. Ninety-Nine Diamonds, 139 Fed. 961, 964, 72 C. C. A. 9, 12, 2 L. R. A. (N. S.) 185. Conceding that by study, reflection, and ingenious reasoning unusually acute and able minds may discover and convince themselves of a construction of this statute and an intention of its makers which would include this bank and the collection of the draft with which it is charged in its denunciation, still it is certain that that construction and intention are so curious and recondite that the statute failed to express them to the minds of the Secretary of the Treasury, of the Attorney General, and of Judge Campbell after a careful study of the law for the purpose of its official interpretation. It fails to manifest such a meaning and intention to our minds, and we cannot hold that it so clearly or plainly expressed them to bankers, and persons unlearned in the law that they may be lawfully condemned thereunder.

And in our opinion the reason why the Secretary, the Attorney General, Judge Campbell, and the defendant below failed to find in this statute any intention of the Congress, or any expression of any intention to condemn the collection by banks of sight drafts for liquor transported in interstate commerce and the delivery of bills of lading therefor to consignees to enable them to obtain possession of the liquor, is that they did not exist. The history of the times and of the proceedings in Congress which led up to the enactment of this statute have convinced that the mischief at which it was leveled was not the collection of sight drafts by banks or ordinary collectors for the purchase price of liquors, although bills of lading were attached thereto and delivered upon the collection, and that it was the collection by carriers, or their agents, of the purchase price for C. O. D. shipments of liquor into prohibition states whereby they became virtually the agents of the liquor dealers in selling their liquors. This mischief existed only in the states wherein the manufacture and sale of liquor was prohibited, for it was only in those states that such C. O. D. shipments evaded the spirit of the state laws. The collection by banks of sight drafts and the delivery of bills of lading attached thereto was, and long had been, a common and universal method of collection of the purchase price of liquors and other articles throughout the entire nation. This is a general law applicable in every state of the Union, and it is incredible that the Congress intended, without mentioning or referring to it in the statute, to strike down this method of collection for the sale of liquors transported in interstate commerce in all the states, in the large majority of which the manufacture and sale of intoxicating liquors were not prohibited.

[2] To our minds the natural and manifest meaning of the declaration in this law that "any railroad company, express company, or other common carrier, or any other person who, in connection with the transportation," etc., shall collect the purchase price, or act as the agent of the buyer or seller, shall be fined, excludes banks, ordinary collectors, and all persons who are not members of the general class of carriers.

This interpretation finds support in the fact that the contrary construction expunges the words "railroad company, express company, or other common carrier, or any other," and makes the statute read "any person who," etc., and in the rule, which is especially applicable to statutes defining crimes and regulating their punishment, that where general words follow the enumeration of particular classes of persons or acts the general words should be construed to apply to persons or acts of the same general nature or class as those enumerated. Thus, where a statute imposed a forfeiture for forbidden acts of the goods of any "owner, importer, consignee, agent, or other person," it was held that the words "other person" did not include a stranger to the goods, but was limited to "some one of the same general class as those described by the words with which it is associated." United States v. 1150½ Pounds of Celluloid, 27 C. C. A. 231, 237, 240, 82 Fed. 627, 633, 636; 36 Cyc. 1119, 1120; 2 Lewis' Sutherland Statutory Construction (2d Ed.) § 422; United States v. Bevans, 3 Wheat. 336, 390, 4 L. Ed. 404; Moore v. American Transportation Co., 24 How. 1, 35, 36, 16 L. Ed. 674; United States v. Chase, 135 U. S. 255, 258, 259, 10 Sup. Ct. 756, 34 L. Ed. 117. It is well said at page 1120, 36 Cyc., that:

"The particular words are presumed to describe certain species, and the general words to be used for the purpose of including other species of the same genus. The rule is based on the obvious reason that, if the Legislature had intended the general words to be used in their unrestricted sense, they would have made no mention of the particular classes. The words 'other' or 'any other' following an enumeration of particular classes are therefore to be read as 'other such like' and to include only others of like kind or character."

[3] This is the interpretation of this act of Congress which was given to it by the Secretary of the Treasury and by the Attorney General, who were charged with the duty of executing it, and it is an established rule of the national courts that the contemporaneous construction given to an act of Congress by those charged with its execution, though not controlling, is entitled to great weight, and should not be disregarded or overturned except for cogent reasons, nor unless it is clear that their construction was wrong. Edward's Lessee v. Darby, 12 Wheat. 206, 210, 6 L. Ed. 603; United States v. Moore, 95 U. S. 760, 763, 24 L. Ed. 588; United States v. Johnston, 124 U. S. 236, 253, 8 Sup. Ct. 446, 31 L. Ed. 389; United States v. Philbrick, 120 U. S. 52, 59, 7 Sup. Ct. 413, 30 L. Ed. 559; United States v. Hill, 120 U. S. 169, 182, 7 Sup. Ct. 510, 30 L. Ed. 627; Baker v. Swigart, 199 Fed. 865, 873, 118 C. C. A. 313; United States v. Miller (C. C.) 187 Fed. 369, 370; United States v. Newport News Shipbuilding & D. D. Co., 178 Fed. 194, 204, 101 C. C. A. 514, 524.

[4] Because the reasons in support of the construction given to section 239 of the Penal Code by the Secretary and the Attorney General are in our opinion more cogent and persuasive than those against it, because it is not clear that their interpretation was erroneous, but it seems to us to give to this act of Congress its true meaning, because the bank and the act for which it has been fined are not specified in the statute, nor included within the classes of persons or acts denounced by it, nor within other classes of their kind, and because the statute is

a new law creating a new offense and prescribing its punishment, and it fails plainly or clearly to express any denunciation of the collection by a bank, or any other collector of its class, of a sight draft for the purchase price of liquor transported in interstate commerce and the delivery of a bill of lading attached to the draft to the consignee to enable him to get possession of the liquor, our minds have been forced to the conclusion that the acts charged against the bank in the second count of the indictment in this case upon which it was convicted constituted no offense, and that the judgment below must be reversed, with directions to the court below to discharge the bank.

It is so ordered.

TRIEBER, District Judge (dissenting). After giving the questions involved the most diligent consideration, I find myself unable to concur in the conclusions reached by the majority, as, in my opinion, they are in conflict with the letter as well as the spirit of the statute. In view of the far-reaching effect of this decision, which substantially nullifies the provisions of this act of Congress by opening the doors to the introduction of liquors in localities where the sale thereof is prohibited by law, and permits the collection of the purchase money at the time and place of delivery, I deem it my duty to state briefly my reasons for the dissent.

The history of the entire liquor legislation, as affected by the Interstate Commerce clause of the national Constitution, the mischief existing, and sought to be remedied by this act, are fully set out in the opinion of the learned trial judge in this case (190 Fed. 336), and therefore need not be restated.

I concur with the majority opinion that:

"A penal statute which creates a new crime and prescribes a punishment for it must clearly state the persons and acts denounced. A person who, or an act which, is not by the expressed terms of the law clearly within the class of persons and within the class of acts it denounces, will not sustain a conviction under it."

But it is equally well settled that penal laws are not to be construed so strictly as to defeat the obvious intention of the Legislature. United States v. Lacher, 134 U. S. 624, 628, 10 Sup. Ct. 625, 33 L. Ed. 1080; United States v. Corbett, 215 U. S. 233, 242, 30 Sup. Ct. 81, 54 L. Ed. 173; United States v. Union Supply Co., 215 U. S. 50, 55, 30 Sup. Ct. 15, 54 L. Ed. 87. And this rule specially applies when the statute is enacted for the public good, and to suppress a public wrong. Taylor v. United States, 3 How. 197, 210, 11 L. Ed. 559; United States v. Stowell, 133 U. S. 1, 12, 10 Sup. Ct. 244, 33 L. Ed. 555; Johnson v. Southern Pac. Co., 196 U. S. 1, 16, 25 Sup. Ct. 158, 49 L. Ed. 363.

In my opinion the statute clearly includes not only all common carriers and their employés, but "any other person" who "in connection with the transportation of intoxicating liquors in interstate commerce, shall collect the purchase price thereof before, on or after delivery, from the consignee or from any other person," regardless of the fact that he is not an employé of the carrier. It is a well known fact that

shipments of all kinds of merchandise, cotton, grain, lumber, raw material as well as manufactured articles, which are sold for cash upon delivery are shipped by the method employed in this case, i. e., either naming no specific consignee, but requiring the delivery to be made to the order of the shipper, or that the bill of lading specifically requires its production and surrender by the consignee before the property can be delivered. In such cases a draft is usually drawn for the purchase money, and the bill of lading attached thereto, to be delivered upon payment of the draft. The effect of such shipments differs in no wise from those usually referred to as C. O. D., as the purchaser can in neither event obtain the goods shipped without first paying the purchase price. It is to be noted that the statute itself does not use the expression "C. O. D." and draws no such distinction as stated in the opinion of the majority. For that matter, such shipments are frequently spoken of as C. O. D. shipments. Norfolk & West. R. R. Co v. Sims, 191 U. S. 441, 446, 24 Sup. Ct. 151, 48 L. Ed. 254. As liquor shipments made in this manner to prohibition localities from other states practically nullified the prohibition laws of those states, as had been determined by the Supreme Court in a number of cases (American Express Co. v. Iowa, 196 U. S. 133, 25 Sup. Ct. 182, 49 L. Ed. 417; Adams Express Co. v. Kentucky, 214 U. S. 218, 29 Sup. Ct. 633, 53 L. Ed. 972), efforts were made to induce Congress to enact some legislation which would prevent violations of the prohibition laws of the states by these methods. To accomplish this object a number of bills were introduced; but, as the act now involved is the Senate Bill prepared by the committee to whom all Senate bills on that subject had been referred, it is only necessary to refer to the Senate proceedings seeking to accomplish this object. Among these bills was one known as the "Bacon Bill," and the part of that bill which refers to the subject now in controversy was section 2 of that bill. That part of it bearing on this subject is worded as follows:

"That whenever any spirituous, intoxicating and malt liquors of any kind shall be or become a part of a foreign or interstate commerce, it shall be unlawful for any railroad company, express company or other carrier, or any officer, employé or agent thereof engaged in or in connection with the transportation of such liquors of any kind from one state or territory or district into another state or territory or district," etc.

The "Brantley Bill," although it had been introduced in the House, was before the subcommittee which finally drafted the bill as enacted, and which is known as the "Knox Bill," provided:

"That any railroad company, express company or other common carrier or other person, who shall in connection with the transportation of spirituous, vinous, malt and intoxicating liquors of all kinds from one state or territory into another state or territory collect on, before or after delivery from the consignee or other person the purchase price or any part thereof of such liquors, or who shall in any manner act as the agent of the consignor or seller of such liquors, for the purpose of selling or completing the sale thereof," etc.

The subcommittee had a number of public hearings on these bills, and finally adopted the bill which is now section 239 of the Penal Code, practically adopting the language used in the "Brantley Bill."

It would be unreasonable to presume that the members of that

subcommittee, composed of some of the ablest lawyers of the Senate, were not familiar with the practice of collecting for the goods by draft with bill of lading attached as hereinbefore set forth, so general in the commerce of the country, and that that practice was, in effect, a C. O. D. shipment as had been held several years before in Norfolk & West. R. R. Co. v. Sims, supra; and, if the intention of this act was to make the bill effective, it was just as important to prohibit such shipments as those made C. O. D. with directions to the carrier to collect the purchase price before delivery. But, even assuming that the subcommittee was not familiar with that custom, their attention was expressly called to it by a letter from Robert Norris, secretary of the Kansas State Temperance Union, which was filed with the committee and appears on page 113 of the committee's report. In that letter Mr. Norris says:

"Intoxicating liquors are shipped into Kansas under interstate commerce just as though there were no prohibitory laws in the state. The money is either sent with the order or is collected by some agency in the state. A sight draft is usually sent to the bank and the bank collects the money for the liquor house. The express companies no longer handle C. O. D. liquors but send them express charges prepaid, and a sight draft to the bank. * * * Since the express companies refuse to handle the C. O. D. liquors there is not much complaint of shipping in fictitious names, but express agents that are inclined to violate the law have a means of handling bills of lading and collecting for liquors where the express charges are prepaid that is very hard to detect. Agents have informed me in various parts of the state that they have been offered by liquor houses a commission of fifty cents to one dollar and one-half for handling the liquors through the express office, and ofttimes this temptation to make money causes them to yield and they deliver it to any parties who will pay the charges that may be against the person to whom it is sent. * * * Of all phases of the prohibitory law this interstate commerce feature is the hardest to control, even to keep it within the bounds of interstate commerce law. The keeper of a 'blind tiger,' or a 'bootlegger' or a druggist who may violate the provisions of his permit are very easily caught as compared with the persons who overreach the bounds of the law in the shipment of liquor."

If the construction placed upon this statute by the majority opinion is correct, then nothing has been accomplished by the enactment of this statute, for the brewer or liquor dealer can make a large number of shipments to his agent or the person who is willing to engage in the sale of liquors or beer, some in boxes containing dozens of bottles, others in jugs or single bottles, taking separate bills of lading for each, attach a separate draft for the purchase price of each package of the liquor or beer covered by each bill of lading, all drawn on one person who, after having paid the drafts, would receive these bills of lading and deliver them with an order to the carrier indorsed thereon to any person who would purchase the quantity covered by any one bill of lading, and thus the mischief which the statute clearly intended to remedy can be continued without fear of being punished, for he could justly claim that he is not "a person connected with any railroad company, express company or other common carrier."

It is true, as stated by the majority of this court, that courts "may not assume or presume purposes and intentions that the terms used in the statute do not indicate and then by construction practically

enact or expunge provisions to accomplish such supposed intentions." But, on the other hand, it is equally true that it is the duty of the courts to give effect to every word found in the statute. Bend v. Hoyt, 13 Pet. 263, 10 L. Ed. 154; Lawrence v. Allen, 7 How. 785, 12 L. Ed. 914; Washington Market Co. v. Hoffman, 101 U. S. 112, 25 L. Ed. 782; Montclair Twp. v. Ramsdell, 107 U. S. 147, 2 Sup. Ct. 391, 27 L. Ed. 431. As stated by Judge Sanborn, delivering the opinion of this court in Stevens v. Nave-McCord Merc. Co., 150 Fed. 71, 75, 80 C. C. A. 25, 29:

"Cardinal rules for the construction of a statute are that the intention of the legislative body which enacts it should be ascertained and given effect, if possible, regardless of technical rules of construction and the dry words of the enactment; that that intention must be deduced not from a part but from the entire law; that the object which the enacting body sought to obtain and the evils which it was endeavoring to remedy may always be considered for the purpose of ascertaining its intentions; that the statute must be given a rational, sensible construction; and that, if this be consonant with its terms, it must have an interpretation which will advance the remedy and repress the wrong."

The effect of the majority opinion is to practically eliminate the words "any other person" unless Lord Tenterden's rule of ejusdem generis, which is invoked by the plaintiff in error, governs the construction of this statute. In my opinion it does not. United States v. Mescall, 215 U. S. 26, 32, 30 Sup. Ct. 19, 54 L. Ed. 77, is directly in point on this proposition. In that case the statute under which the prosecution was had provided:

"That if any owner, importer, consignee, agent or other persons shall make or attempt to make any entry of imported merchandise by means of any fraudulent or false invoices," etc.

The defendant, who had been indicted for a violation of this statute, was neither the owner, importer, consignee, or their agent, but was an assistant weigher of the United States in the customs service at the port of New York, and engaged in the performance of his duties as such assistant weigher when the fraud was perpetuated on the government. Lord Tenterden's rule was invoked on behalf of the defendant, and the claim set up that the general term "other person" should be read as referring to some one similar to those named, whereas the defendant was not an owner, importer, consignee, or agent, or of like class with either; he was not making or attempting to make an entry. The Circuit Court sustained this contention, but upon writ of error the Supreme Court reversed this ruling and held that the words "other person" included all persons, although having a different relation to the importation than the owner, consignee or agent. Mr. Justice Brewer, who delivered the unanimous opinion of the court, said:

"Congress was broadening the scope of the legislation and meaning to reach other persons having something to do in respect to the entry beyond that which was done by the owner, importer, consignee or agent, or else the term 'other person' was a meaningless addition. Now the defendant was a person other than the owner, importer, consignee or agent, by whose act the United States was deprived of a portion of its lawful duties. His act comes

within the letter of the statute as well as within its purpose, and the intent of Congress by the legislation is the ultimate matter to be determined."

The court, in discussing the effect of Lord Tenterden's rule, cited and adopted the rule laid down in National Bank of Commerce v. Ripley, 161 Mo. 126, 61 S. W. 587:

"But this is only a rule of construction to aid us in arriving at the real legislative intent. It is not a cast iron rule; it does not override all other rules of construction, and it is never applied to defeat the real purpose of the statute, as that purpose must be gathered from the whole instrument. * * * Whilst it is aimed to preserve a meaning for the particular words, it is not intended to render meaningless the general words. Therefore, where the particular words exhaust the class, the general words must be construed as embracing something outside of that class. If the particular words exhaust the genus, there is nothing ejusdem generis left, and in such case we must give to the general words a meaning outside of the class indicated by the particular words or we must say that they are meaningless, and thereby sacrifice the general to preserve the particular words. In that case the rule would defeat its own purpose."

There are many other cases in which the words "any other" were similarly construed. Regina v. Payne, L. R. 1 C. C. 27, where the statute made it a felony to facilitate the escape of a prisoner by conveying to the prison "any mask, dress or other disguise, or any letter or *any other* article or thing" was held to include a crowbar. In Hilton's Appeal, 116 Pa. 358, 9 Atl. 342, the statute authorized every lessee of any colliery, mining land, manufactory, or *other premises* to mortgage his lease or term, and it was held that the statute was not restricted to leases of the same or like nature as colliery, mining, or manufactory leases. In Grissell v. R. R. Co., 54 Conn. 467, 9 Atl. 137, 1 Am. St. Rep. 138, the statute made railways liable for fires to buildings or *other property,* and it was held that the words "or other property" should not be confined to subjects ejusdem generis. To the same effect are Harlow v. Tufts, 4 Cush. (Mass.) 453; Phœnix Cotton Co. v. Hazen, 118 Mass. 350; Archer v. People's Savings Bank, 88 Ala. 254, 7 South. 53; Holcomb v. Van Zylen (Mich.) 140 N. W. 521; and this is especially true if the particular words, as is the case in this statute, exhaust a whole genus, in which case the general words must refer to some larger genus. Fenwick v. Schmaltz, L. R. 3 C. P. 315.

Applying this rule, it is clear to my mind that the intention of Congress was to cover such a transaction as is involved in the instant case. If the construction placed upon that act by the majority is correct, and that was the intention of Congress, it would have adopted the language found in section 2 of the "Bacon Bill," which did not use the words "or any other person," but in lieu thereof used the words "or any officer, employé or agent thereof," clearly indicating that the law was intended to apply only to the carriers, their officers, employés, and agents.

The majority also lay stress upon the construction placed upon this statute by the Secretary of the Treasury and the Attorney General. While it is true that the contemporaneous construction given to an act of Congress by those charged with its execution is entitled to great weight and should not be disregarded or overturned except for cogent

reasons, nor unless it is clear that the construction was wrong, such interpretation is not controlling, and is never conclusive upon the courts. Hemmer v. United States, 204 Fed. 905, decided by this court on April 25, 1913, where Judge Sanborn, delivering the opinion of the court, said:

"A decision of a question of law by the officers of the Land Department, or by any officer of any other executive department is never conclusive upon the courts. * * * And it is the function and duty of the officers of the judicial department of a government, which they may not lawfully renounce, to exercise their own independent judgments, guided only by the established legal principles and the recognized canons of interpretation, in the construction of its statutes and to adjudge their just and true interpretation, even though the officers of an executive department have construed them otherwise."

A large number of authorities are cited by the learned judge to sustain that conclusion.

It must not be overlooked that these departmental officers, including the Attorney General, determine these questions in most instances, and did in this, without the assistance of argument from lawyers or other persons learned in the law. How much aid is derived from such arguments and briefs is well known to every judge on the bench. There can be no better illustration of this than the fact that frequently the judges of the Supreme Court call for rearguments in order to assist them in reaching a correct determination of important principles of law. And it has been well said that "a strong bar makes a strong bench."

Neither in United States Express Co. v. Friedman, 191 Fed. 673, 112 C. C. A. 219, nor in United States v. 87 Barrels of Wine (D. C.) 180 Fed. 215, was this question before the court, and what was there said was clearly obiter so far as it affects the principle now in issue.

The act is also attacked as being unconstitutional, for it is alleged that the courts have uniformly held that liquors are an article of commerce, and the effect of this act is to deprive the owners of their property in violation of the fifth amendment to the Constitution of the United States. But the statute does not prohibit commerce in liquors; it only regulates the transportation thereof. United States v. Delaware & Hudson R. R. Co., 213 U. S. 366, 410, 29 Sup. C. 527, 53 L. Ed. 836, goes much further than is necessary to sustain this act.

In view of the decisions of the Supreme Court in the Lottery Cases, 188 U. S. 321, 358, 23 Sup. Ct. 321, 47 L. Ed. 492; Hipolite Egg Co. v. United States, 220 U. S. 45, 58, 31 Sup. Ct. 364, 55 L. Ed. 364; and Hoke v. United States, 227 U. S. 308, 33 Sup. Ct. 281, 57 L. Ed. ——, it is no longer open to contention that the powers of Congress in matters of interstate commerce have the quality of police regulations. As stated in Hoke v. United States, after reviewing the former decisions of the court:

"The principle established by the cases is the simple one, when rid of confusing and distracting considerations, that Congress has power over 'transportation among the several states,' that the power is complete in itself, and that Congress, as an incident to it, may adopt not only the means necessary but convenient to its exercise, and the means may have the quality of police regulation."

206 F.—25

That under the police power every government has the right to regulate or prohibit the manufacture and sale of liquors is no longer open to controversy. The License Cases, 5 How. 504, 576, 12 L. Ed. 256; Bartemeyer v. Iowa, 14 Wall. 129, 21 L. Ed. 929; Foster v. Kansas, 112 U. S. 201, 206, 5 Sup. Ct. 8, 97, 28 L. Ed. 629; Kidd v. Pearson, 128 U..S. 1, 16, 9 Sup. Ct. 6, 32 L. Ed. 346; Mugler v. Kansas, 123 U. S. 623, 668, 8 Sup. Ct. 273, 31 L. Ed. 205.

In my opinion the judgment of the court below was right, and should be affirmed.